**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dennis KING, Defendant–Appellant.**

**No. 94–3885.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1995.

Decided Feb. 12, 1996.

Barry Rand Elden, Chief of Appeals, James Conway (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Jeffrey B. Steinbeck, Andrew M. Plunkett, Genson, Steinback, Gillespie & Martin, Chicago, IL, Leonard C. Goodman (argued), Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Dennis King of six counts of using interstate facilities with the intent to hire someone to murder his wife in violation of 18 U.S.C. § 1958. King appeals his conviction on various grounds. We affirm.

## I.

A summary of the evidence at trial demonstrates how this failed marriage evolved into a rancorous plot to commit murder. Dennis King was a successful businessman with considerable assets. He owned Barber King, a prosperous company which sold a popular hair cutting device. The assets of his family and business together totaled many millions of dollars. But his success in business was not matched by success in marriage. King married his wife Frances in 1975. They had two sons. In November 1990 Frances King filed for divorce.

The Kings' divorce proceedings were bitter. Because the Kings were unable to settle on a division of their considerable assets or arrive at an amount of monetary support for Frances King and the children, the Illinois state court judge presiding over their divorce action ordered various support payments which Mr. King paid only intermittently. At one point he was $92,000 in arrears in these payments, and the judge threatened King with contempt. The state court judge also enjoined King's brother, Edward, from transferring money for King, and placed a temporary restraining order on King from dissipating assets.

As the divorce proceedings dragged on and settlement discussions bore no fruit, Dennis King became progressively more angry and frustrated. King shared these feelings with his nephew, John King (the son of Dennis' brother, Edward), who worked as a disc jockey in Cody, Wyoming. John King testified that beginning in the fall of 1991, and continuing through December 1993, Dennis King talked to him on a number of occasions about having his wife Frances killed. At first, Dennis and John King talked less frequently, but during each of the conversations, the same topic arose: Dennis King wanted John King to either murder Frances King himself or hire someone else to kill her.

At Christmas time 1991 John King was in the Chicago area for the holidays. During that visit John said that his uncle showed him $50,000 and asked him to "make a plan to do it or find somebody that would kill

Fran." By June 1993 the situation had become even more intense. Dennis King traveled to Wyoming ostensibly on vacation. John said that on this trip his uncle told him "with increased intensity and urgency" that "an end needed to come soon to the divorce proceedings."

On December 1, 1993, Dennis King in Illinois contacted his nephew John King in Wyoming by telephone. At the time John King was working in the production room at a radio station. After talking to Dennis for a few minutes, John activated recording equipment in the studio and taped the remaining portion of the conversation without alerting Dennis. That same day John approached the local police with the recording; the police immediately turned it over to the F.B.I. John later agreed to record future conversations with his uncle. Between December 1 and 15, 1993, John King in Wyoming had a total of eight conversations with Dennis King in Illinois, all of which he recorded, and all of which were admitted as evidence and played for the jury at Dennis' trial.

Dennis King's recorded conversations were introduced to demonstrate his intent to have his wife murdered. In the first conversation on December 1, 1993, Dennis updated his nephew on the status of the divorce proceedings, including that he, Dennis, had been threatened with jail for dissipating marital funds. Dennis stated repeatedly in this conversation that he did not want his nephew directly involved in the murder, but that he wanted John to find someone to do it. Two days later John King called his uncle and advised him that he had thought about his uncle's offer and could "probably hook you up." Dennis cut the conversation short, explaining to his nephew that the telephone line might be tapped and that he would call him back shortly. Fifteen minutes later Dennis called John and told John that he would like "it" to be committed within the next few weeks and while he was in El Paso, Texas, giving him an alibi. John King falsely advised his uncle that he had "found a guy out here" to commit the murder. Dennis told John that he would pay $20,000 for a hit-man, and that he would pay $5,000 to his nephew as a "finder's fee." They concluded the conversation and agreed to talk the following Monday by telephone.

That Monday, December 6, 1993, John King telephoned Dennis. Dennis told his nephew his motivation for wanting his wife murdered: his anger about her getting custody over their two boys and expending hundreds of thousands of dollars in legal fees for the divorce proceedings. John King again pretended that he had found a hit-man to kill his aunt, and advised Dennis that the hit-man was responsible and had military experience. Dennis told John that Frances worked at a jewelry store and he gave John the location of the store. Dennis again expressed his dislike of using the telephone, which could be tapped, and concluded the conversation, only to travel to a pay telephone and call John back fifteen minutes later. In that conversation Dennis discussed the potential of the telephone line being tapped, and admonished John that "she [Frances] richly, fully expects to get whacked." Dennis told John that the hit-man should travel to Chicago to "size up the operation" and that Dennis wanted John to hold all the money, except for the hit-man's travel expenses, and "when the job is complete, and I say complete, then you pay him." Dennis instructed his nephew that the hit-man should fly to Milwaukee, rent a car, and drive to Palatine, Illinois, where Dennis would wait for him in a parking lot. Dennis promised to send cash to John via Federal Express for the hit-man's travel expenses if Dennis' terms were acceptable to the hit-man. When John asked Dennis how he wanted Frances murdered, Dennis suggested a holdup at the jewelry store where she worked. When John noted that the store may have a security system, Dennis suggested a carjacking in the alternative. When John warned his uncle that the hit-man could not fly to Chicago from Wyoming with a weapon, Dennis offered the use of two guns for the murder, a .38 pistol that "can be used as a throw-away", as well as a .357 caliber second gun. Both of these guns were later found in a barn located on property the Kings owned in Barrington, Illinois. Dennis King had access to this property during the divorce proceedings, and admitted at trial that he owned the guns.

Later in the evening of December 6, 1993 Dennis King called his nephew from another pay telephone. Dennis told John that he would provide the hit-man with a map when the hit-man arrived in Chicago. Dennis set the following Monday, December 13, 1993, as the date for the hit-man to fly to Milwaukee, travel to Palatine, and meet with Dennis. When John inquired whether or not Dennis could secure Frances's work schedule, Dennis told John that "I don't want it done at the house." When John asked whether his uncle wanted "it" (Frances's dead body) found or not, Dennis said "probably", and suggested that her body be found "within a couple days." Dennis and John agreed to discuss their plans later.

On December 8, 1993, John King in Wyoming received a Federal Express package from Dennis King in Illinois which contained $2,000 in cash, comprised of twenty $100 bills, and the petition for order of protection filed by Frances King, which included her affidavit that alleged six instances of violent behavior by Dennis King. The package also contained a handwritten note from Dennis to John which discussed how "she expects me to kill her or hire someone that I know has the ability." In the note Dennis directed John not to discuss "direct details" over the telephone, to use "extreme caution," and for John and his "associate" to "be aware of the danger and obstacles before and after."

The next day Dennis called his nephew and told him to put the plot "on hold temporarily because she is not at work and has not been for a week." On December 15, 1993, Dennis called John from another pay telephone, told John "we're still on," and made arrangements for them to meet the following Monday, December 20. Ninety minutes after this last recorded conversation concluded, the F.B.I. arrested Dennis King. He was charged with use of interstate commerce facilities with intent that murder or conspiracy to murder be committed in violation of the laws of Illinois as consideration for something of pecuniary value in violation of 18 U.S.C. § 1958. Dennis pleaded not guilty, but a jury convicted him of six counts of conspiracy to have his wife murdered. Dennis appeals this conviction.

## II.

On appeal, Dennis King challenges the district court's exclusion of evidence and the jury instructions.

### A. Exclusion of Evidence

King argues first that the district court improperly excluded the testimony of his friend William Cumming. King asserts that Cumming would have testified about two conversations with King, the first of which included an invitation to attend a meeting. King would argue that the meetings were with the hit-man, and that these conversations corroborated King's defense of intent to terminate the murder scheme.

At trial King's counsel examined Cumming concerning two conversations "of an unusual nature" which occurred between Cumming and King sometime between December 8 and 15, 1993. When King's counsel inquired as to whether "Mr. King asked you [Cumming] something," government counsel raised a hearsay objection. At a sidebar conference King's counsel made an offer of proof: if asked the question "did Mr. King ask you to do something", Cumming would testify that "Mr. King asked me to attend a meeting." Upon hearing what Cumming's testimony would be, the government also raised a relevance objection. The district court sustained the objection, refusing to allow Cumming to testify further concerning this first conversation with King.

Cumming also testified that he had a second conversation with King on or about December 13, 1993. The government objected (without specifying a ground) to any testimony from Cumming concerning what King asked Cumming to do in this second conversation. The district court sustained the objection. No offer of proof was made with respect to the second conversation.

### 1. First Conversation

■ We conclude the district court prematurely sustained the government's hearsay objection with regard to the first conversation. When King's counsel inquired as to whether "Mr. King asked you [Cumming]

something," that question did not necessarily elicit hearsay. The proposed answer to the challenged question—"Mr. King asked me to attend a meeting"—verifies only the fact that the request was made, rather than going to the truth or falsity of the statement. Accordingly, at that point the hearsay rule was not properly invoked. The response to what may have been the next question—"Why did he want you to attend the meeting?"—very well could be hearsay. But because the questioning never got that far, and King's counsel's offer of proof was not at all adequate, we can only speculate where he was going.

■ We also conclude, however, that even if the district court incorrectly excluded Cumming's purported testimony on this question as hearsay, any error in its exclusion was harmless. As we related recently:

"[T]his Court will only overturn a conviction on evidentiary grounds if the error had a substantial influence over the jury. If the harmlessness of the error is in grave doubt, relief must be granted. When the error precludes or impairs the presentation of a defendant's sole means of defense, the error has had a substantial and injurious effect on the jury. Finally, if the evidence of guilt was overwhelming and the defendant was allowed to put on a defense, even if not quite so complete a defense as he might have reasonably desired, this Court will find the error harmless."

*United States v. Wimberly,* 60 F.3d 281, 286 (7th Cir.1995) (citations and internal quotes omitted).

King was allowed to put on his defense, "[even] if not quite so complete a defense as he might reasonably have desired." *United States v. Hanson,* 994 F.2d 403, 407 (7th Cir.1993) (internal quote omitted). The prosecution argued facts and inferences derived from King's taped conversations. King had plenty of opportunity to challenge these arguments in a way that he thought would support his defense of lack of intent to follow through with the plan. Indeed, King advanced his defense in the best way possible, by attempting to convince the jury with his own testimony. Limiting Cumming's testi-

mony did not preclude King's theory of defense. He had sufficient means to relay that theory to the jury.

Moreover, any erroneous exclusion of part of Cumming's testimony was harmless in light of the overwhelming evidence of King's guilt. The crucial question is whether a reasonable jury could find that King intended to commit murder for hire from the record evidence even including Cumming's purported testimony. The taped phone calls in which King conspired to hire someone to murder his wife established a lengthy and substantial chain of inculpatory evidence going back to 1991. By the time Cumming came into the picture, the crime had been committed. Even if we were to speculate that King's purpose in having Cumming in tow was to show that he intended to call the murder off ("evidence" that King changed his mind) the crime of use of interstate facilities to conspire to commit murder for hire had long been underway. The trial evidence is replete with numerous acts advancing the conspiracy. King was not charged with murder—only use of interstate facilities to conspire to commit murder for hire. That indelible deed was done, and Cumming's presence (for whatever reason) could not eradicate it.

Even given all of this, nothing in Cumming's proposed testimony indicates that King intended to call off the murder scheme and send the hit-man back to Wyoming. Rather, according to King's counsel's proffer, all that Cumming was going to say was that King requested that Cumming attend a meeting. It is wishful hindsight to conclude that King intended to call off the scheme and Cumming would witness that change of heart. It is important to note what King's counsel did *not* proffer: that King called Cumming to show that Cumming would attend the meeting with the hitman as "moral support" for King's "change of mind"; that Cumming's testimony would not incriminate him; and that Cumming's alleged exculpatory testimony would not fly in the face of logic. King's counsel could have included many things in this offer of proof. He did not.

For these reasons, we are satisfied that the excluded testimony would not have had a

substantial influence on the jury's rejection of this defense. Cumming's response could not have overridden the earlier evidence of King's intent to commit murder for hire. Any evidentiary error in excluding the substance of this first conversation was harmless.

### 2. Second Conversation

King's argument for the admissibility of the second conversation fails because he did not properly preserve any objection he had to the district court's rulings. This court has limited power to correct errors that were forfeited because they were not timely raised in the district court. *United States v. Olano,* 507 U.S. 725, 730, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993); *United States v. Perez,* 43 F.3d 1131, 1135–36 (7th Cir. 1994). Before this court can review a purported error which has been forfeited, Federal Rule of Criminal Procedure 52(b) provides that such an error must be "plain" and "affect substantial rights." *Olano,* 507 U.S. at 730, 113 S.Ct. at 1776; *Perez,* 43 F.3d at 1136. At trial King made no offer of proof as to what the specific testimony would be in this second conversation, nor did King offer any reasons as to why this testimony was not objectionable. King concedes this failure in his brief to this court. Although King speculates as to what Cumming's testimony would have been had the objections not been sustained, we too can only speculate, as King made no offer of proof. The district court's exercise of discretion to exclude evidence concerning the December 13, 1993 conversation with King cannot be deemed plain error without a record having been made at the time the testimony was offered. When the government's objections were sustained, counsel made no record of what the testimony would have been or the arguments King's counsel would have offered in response to the objections. Without an offer of proof containing a description of the substance of the conversation between Cumming and King, and counsel's arguments why the statement would be admissible, we have no additional record to review.

Nor was the second conversation so closely linked with the first conversation that we can assume the offer of proof for the first extended to the second as well. The two conversations may have differed. Cumming testified that the two conversations took place on different days. He also said that at least one other person—a second nephew, Brian King—was present at the second conversation but was not present at the first. We are aware of no authority that allows an offer of proof to apply in blanket fashion to one objection in temporal proximity to the offer of proof on another objection. Although we do not require that a formal offer of proof be made, the record must show the equivalent: grounds for admissibility, the proponent must inform the court and opposing counsel what he expects to prove by the excluded evidence, and he must demonstrate the significance of the excluded testimony. *See United States v. Peak,* 856 F.2d 825, 832 (7th Cir.1988) (citing Fed.R.Evid. 103(a)). Because King's trial counsel made no record whatsoever with regard to the second conversation, we cannot discern the substance of the proposed second conversation. It could be the same or different than the first. We also can only assume its significance to the proposed defense. No grounds for admissibility were offered for the second conversation.

The district court either properly sustained the government's objection to any testimony concerning the substance of the two conversations between Cumming and King, or any error committed in the exclusion of such testimony was harmless.

### B. Entrapment Jury Instruction

King next contends that the jury in this case should have been instructed on the law of entrapment. At the jury instruction conference King submitted an entrapment instruction, but the district court rejected it. We have plenary review over the district court's decision not to instruct the jury on entrapment. *United States v. Jones,* 21 F.3d 165, 171 (7th Cir.1994).

A valid entrapment defense requires proof of two related elements: (1) government inducement of the crime, and (2) lack of predisposition on part of the defendant to engage in criminal conduct. *Mathews v.*

*United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Santiago–Godinez,* 12 F.3d 722, 728 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1630, 128 L.Ed.2d 354 (1994). Before the defendant may raise an entrapment defense, he must offer sufficient evidence of both the government's inducement and his own lack of predisposition. *Santiago–Godinez,* 12 F.3d at 728.

 King's assignment of error on this issue fails for two reasons. First, King failed to object to the district court's rejection of his entrapment instruction and state the grounds for his objection. Federal Rule of Criminal Procedure 30 provides in part:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

Pursuant to Rule 30, submission of a jury instruction without a timely objection to its exclusion from the charge and distinct statements on the matter to which the party objects and the grounds for the objection does not preserve a right to appeal that exclusion. *United States v. Lakich,* 23 F.3d 1203, 1207 (7th Cir.1994) (and citations therein). King's counsel registered no such objection to the exclusion of the entrapment instruction, nor did he relate the requisite grounds to preserve his right to appeal this issue.

 Second, the district court properly concluded that the evidence as presented at trial did not support a finding of entrapment under either of the two related elements, government inducement and lack of predisposition. King's nephew came forward to law enforcement officials after a three-year period during which King had discussed killing his wife; the government did not approach King. The government's instructions to John King to appear to agree to his uncle's overtures to find a hit-man do not constitute inducement. In the second recorded conversation John King told Dennis King that he thought about Dennis' offer, and said he could "probably hook you [Dennis] up." Dennis did not

correct John that no such offer had been extended. The taped conversations demonstrate that the government let the murder-for-hire scheme unfold. Indeed, the only active role the government appears to have taken was to place Frances King's car in the jewelry store parking lot to confuse Dennis King as to his wife's whereabouts. Affording a defendant an opportunity or facility for the commission of the offense does not constitute entrapment. Artifice and strategy may be employed to catch those engaged in criminal conduct. *See Jacobson v. United States,* 503 U.S. 540, 547, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992) (and citations therein).

Moreover, the tapes of the conversations between Dennis and John King, as well as John King's testimony, leave no doubt as to Dennis King's predisposition to commit the crime. The evidence must be considered under the factors listed in *United States v. Casanova,* 970 F.2d 371 (7th Cir.1992), to determine whether King was predisposed to commit the crime charged:

(a) the defendant's character and reputation; (b) whether the suggestion of criminal activity was originally made by the government; (c) whether the defendant was engaged in criminal activity for profit; (d) whether the defendant evinced a reluctance to commit the offense, overcome only by repeated governmental inducement or persuasion; and (e) the type of inducement or persuasion offered by the government.

*Id.* at 375–76.

The record contains reputation evidence of King's violent nature. Also, the suggestion of criminal activity was originally made by Dennis King, not the government. In the first recorded conversation Dennis King spoke of his frustration that the divorce proceedings had dragged on for three years, and he requested that his nephew put him in contact with someone who could kill his wife. Further, King set the financial terms for the hit-man, and suggested the murder scenarios at the jewelry store and at a carjacking. Moreover, King would have been able to retain a larger portion of the marital assets if the plan had worked; thus, he would have

profited from the crime. The record is barren on factor (d), whether King evidenced any reluctance to commit the crime. The only concerns King appeared to express was with whether the hit-man might abscond if King paid him too much money up front, that the hit-man should not waste his time visiting Chicago to survey the area if Frances King could not be observed as well, and that the murder not occur while Frances King was at home. Finally, the government offered no inducement to King to commit the crimes. Consequently, the *Casanova* factors dictate that King was in fact predisposed to commit the murder-for-hire crime. The district court did not err in deciding not to instruct the jury on entrapment, as the evidence did not support such an instruction.

## C. Insanity Defense

King also asserts that the district court erred by refusing to instruct the jury on an insanity defense. King tendered a jury instruction on insanity to the district court which the court rejected without comment. King made no attempt to object to this ruling and state reasons for such an objection. Absent such a specific objection, King did not preserve this issue for appeal; thus his claim of error can be reviewed only under the plain error doctrine. Fed. R.Crim.P. 30; *Olano,* 507 U.S. at 730–32, 113 S.Ct. at 1776; *United States v. Starnes,* 14 F.3d 1207, 1213 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994). Our review of the record yields no plain error on this point.

Doctor Peter J. Fink testified at trial that King was a depressed individual. Although King properly filed notice of intent to use the expert testimony of Dr. Fink pursuant to Fed.R.Crim.P. 12.2(b), King failed to give the government notice of any insanity defense. Fed.R.Crim.P. 12.2 expressly states:

(a) *Defense of Insanity* If a defendant intends to rely upon the defense of insanity at the time of the alleged offense, the defendant shall, within the time prescribed for the filing of pretrial motions, notify the attorney for the government in writing of such intentions and file a copy of such notice with the clerk. *If there is a failure to comply with the requirements of this subdivision, insanity may not be raised as a defense.*

(Emphasis supplied.)

King failed to comply with this requirement. Accordingly, King has forfeited his right to object to the district court's refusal to instruct the jury on insanity. *United States v. Buchbinder,* 796 F.2d 910, 914 (7th Cir.1986). Further, King affirmatively acknowledged in discussions with the district court that insanity was not an issue in this case and that there was no evidence to support such a claim. For all of these reasons, we find no error in the district court's refusal to give an insanity instruction in this case.

## III.

The district court's error in its evidentiary ruling on Cumming's testimony was harmless. It properly instructed the jury. Accordingly, we affirm Dennis King's conviction.

Affirmed.