In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3120

Mark Mason,

Plaintiff-Appellant,

v.

Southern Illinois University at Carbondale,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 96 C 4135--James L. Foreman, Judge.

Argued February 25, 2000--Decided December 5, 2000

Before Bauer, Ripple, and Manion, Circuit Judges.

Manion, Circuit Judge. Mark Mason is a black man
who worked as a dispatcher (or
"telecommunicator") for the Department of Public
Safety (the campus police) at Southern Illinois
University (SIU). His health problems frequently
caused him to miss work for substantial periods
of time, and these absences either caused or
greatly contributed to his supervisor's dislike
of him. Mason thought this dislike was racially
motivated, so after he was fired, he sued SIU
under Title VII. A jury found for SIU, and Mason
appeals, contending that the district court erred
in excluding evidence of racial epithets that
some of his coworkers allegedly made when neither
he nor his supervisor were around. Because the
district court did not abuse its discretion, we
affirm.

I.  Background

   Mark Mason worked as a dispatcher at SIU from
1983-1998. His health-related absences from work
(which had always been considerable) increased
substantially after 1991 when Corporal Carol
Kammerer, a white woman, became his supervisor.
One absence lasted nine months, from September,
1994 to May, 1995. When Mason returned to SIU, he
worked for about six weeks, took extended sick
leave again in July, 1995, and never returned to
work. While on his latest leave, Mason filed a

worker's compensation claim against SIU for stress; he also unsuccessfully sought other employment with SIU. Mason settled this claim in the summer of 1998. As part of the settlement, SIU offered him his job back, but Mason refused this offer. Under the civil service rules, SIU had two options at this point--Mason could resign or be terminated. Mason refused to resign, so he was fired.

According to Mason, his refusal to return to work was due to the rocky relationship he had with Kammerer. He claimed she was abusive toward him, such as by allegedly calling him "stupid" and "dumb" when he would incorrectly perform a task. (Kammerer denies referring to Mason ever in this fashion.) Even though Kammerer never made racist remarks in Mason's presence, let alone to him, Mason believed Kammerer treated him badly because he was black and that this treatment exacerbated his health problems, which ultimately prevented him from working for her. He sued SIU under Title VII, claiming racial discrimination in the form of a hostile work environment. The case proceeded to trial, where the district court excluded racial epithets allegedly made by Mason's coworkers which neither Mason nor Kammerer ever heard. Mason lost his case before a jury and appeals the district court's evidentiary ruling, asking for a new trial. Mason now claims that not only his supervisor but also his coworkers created the allegedly hostile work environment. Because there is a distinction in the legal analysis, we first need to resolve this dispute.

A.  Mason's Title VII Claim

A close examination of Mason's complaint discloses that he alleged only that his supervisor, not his coworkers, was racially harassing him. The relevant paragraphs of the complaint are as follows:
21.During the course of his employment with the Defendant, the Plaintiff was subjected to unwelcome harassment by his supervisor, including:

a. Exposure to stress and harassment

b. Exposure to racial epithets

c. Being passed over for promotions and overtime.

* * *

24. That the actions of the Plaintiff's supervisor were performed as an agent of the Defendant herein and in the course of the supervisor's duties as supervisor.

(Emphasis added.) Mason never amended this complaint to include a claim for coworker-created hostile work environment. Nor did he otherwise notify SIU that he was complaining of anything other than a supervisor-created hostile work environment./1

Even at trial Mason continued to insist that Kammerer was the source of his problems. He stated that in 1992 he met with the then-newly hired head of the Public Safety Department, Sam Jordan, to complain that Kammerer was being "racist towards me" by "calling me dumb and stupid and aggravating me." He later complained to Jordan that he had been having "an ongoing problem" with Kammerer "harassing me, and I felt that she was constantly picking on me because I'm black." After years of working underneath Kammerer, Mason testified that his health began to deteriorate. He felt that working for her "was aggravating, humiliating. It was hostile, and I wanted to get [out] from under her." He stated that while he had experienced some health problems before working for Kammerer, his symptoms increased substantially once she became his supervisor. Mason stated that he had talked with "Jordan many times because it appeared to be a constant problem that I was having with Kammerer." As a result, Mason talked with Jordan about getting another job in the department, and he made other efforts "to try to get away from Corporal Kammerer's supervision." Mason went on disability leave in late 1994 because Kammerer's behavior was harming his health:

[W]orking at the Department of Public Safety-- excuse me--working at the Department of Public Safety under Corporal Carol Kammerer was causing too much problems on my health and no--the university wasn't taking no [sic] actions to correct the situation.

(Emphasis added.) He told the jury that after he "had been out of the work environment under Carol--under Corporal Kammerer for several months," his "condition started to improve." He then briefly mentioned that when he returned to work in May of 1995, his white coworkers "acted isolated towards me," not talking "to me like they generally did. Sometimes I would speak to them and they wouldn't even speak back to me." Mason said that when he returned to work for the last time, Kammerer "started treating me the way she normally treated me. Yell at me, scream at me, holler at me. [sic]" According to him, as of the trial, Kammerer was still "in charge of telecommunicators" and he was not "aware of any action that's been taken against her" in response to his complaints about her.

On cross-examination, Mason confirmed that his harassment claim was based on Kammerer's conduct, not that of his coworkers or anyone else:

Q. And you were offered the position you were offered your position to return to once you had completed [maximum medical improvement as part of Mason's workman's compensation claim]?
A. That's correct.
Q. And you said you weren't going to return to the telecommunicator's job at SIU; is that right?
A. No. I said I do not want to return back to work that position working under Corporal Carol Kammerer.
Q. Oh. You would have worked in the radio room, but just under another supervisor?
A. If they would have allowed me.
Q. So it wasn't the radio room? It was Kammerer?
A. Yes.

(Emphasis added.) Mason twice repeated that Kammerer was the cause of his problems./2

The focus of this testimony regarding mistreatment by his supervisor is important because a probationary dispatcher named Patty Shands worked in the telecommunications division for about five months during the spring and summer of 1995. She became friends with Mason and was called to testify on his behalf regarding her observations of the conduct of Kammerer and other employees in the division. A key issue at trial and on appeal is the extent to which the judge limited her testimony.

B.  Shands' Testimony and Mason's Offer of Proof

After he testified, Mason called Carol Kammerer to the stand who, not surprisingly, denied calling Mason "dumb" or "stupid" or using a racial epithet to refer to him or any employee. She denied ever hearing a subordinate make a racially derogatory remark, and stated that she would not allow a subordinate to make such a remark. Mason attempted to ask Kammerer whether she knew that Patty Shands had alleged that a white dispatcher had "used the word 'n' word." At this point, SIU moved to bar Shands' testimony concerning actions by coworkers, arguing that it was not relevant to the claim of supervisor-based harassment that Mason had consistently alleged in his pretrial filings and had just laid out in his own testimony. The district court concluded that Mason was making a claim of a racially hostile work environment caused by his supervisor, Carol Kammerer. As a result, it would allow Shands to testify to anything she heard Kammerer say. And in order to allow Mason to show that Kammerer, as

the racial harasser, was responsible for creating the work environment in general, the district court would also allow Shands to testify to anything that coworkers said in Kammerer's presence (although the court thought even this might be crossing the line into irrelevant testimony). In other words, while Mason's claim was predicated on Kammerer's behavior, the court would allow Mason to develop a theory in which her behavior extended to approving the alleged racist conduct of subordinates.

Shands took the stand and testified that once when Kammerer was upset because Mason's health-related absence forced her to re-do the work schedule, Kammerer referred to Mason as Jordan's "token nigger" in front of Shands and two coworkers. Shands' testimony then violated the court's order when she stated that after Kammerer left the room, one of her two coworkers referred to Mason in the same way. SIU objected, and the district court instructed the jury to disregard this piece of testimony. Shands again went beyond the court's ruling by stating that before Kammerer allegedly referred to Mason in that derogatory manner, Shands had never heard any of her coworkers refer to him that way. Then she testified about another time when Kammerer was upset at having to alter the work schedule and a coworker allegedly referred to Mason as a "token nigger" in front of Kammerer; Kammerer did not react to (let alone discipline) the coworker for doing so. Finally, Shands testified that after she became friends with Mason, her coworkers "blackballed" her. She also noted that after she was fired from the communications division in July, she filed a complaint with SIU discussing "racial issues" in the Department of Public Safety, and she subsequently filed a charge with the EEOC claiming that she was fired because she was friends with Mason.

Mason's counsel made an offer of proof as to what Shands' testimony would have included had the court not restricted her. He said that Shands would have testified that her coworkers: 1) used racial epithets to refer to black people generally or to Mr. Mason in particular, and one coworker called her a "nigger-lover"; 2) told her "not to even mention Mark Mason's name in front of Corporal Kammerer" and that "if she did she would have to look for another job"; 3) told her that "Kammerer hates Mark Mason," was "sick of him and doesn't like having to work with him"; and 4) increased their usage of racial epithets dramatically after Kammerer used a racial epithet to refer to Mason. The district court had excluded the proposed testimony because it would be confusing to the jury and prejudicial; the court was trying "a lawsuit involving Mark Mason

and SIU, and then we jump the track and we start trying Patty Shands' case." It also thought the proposed testimony would be irrelevant: Mason's claim concerned a "hostile work environment brought about by a supervisor, and all the testimony that you were wanting to bring out and have made the offer of proof on does not necessarily tie itself to Ms. Kammerer who is the supervisor involved." And the court considered the testimony to be cumulative because there was already substantial evidence showing Kammerer's hostility. Finally, the court seemed to question whether Shands' testimony would be perjurious. She had executed an affidavit stating that she never heard anyone in the Department of Public Safety use a racial term and that she never heard anyone in the Department use such a term about Mason./3 The jury returned a verdict for SIU. Mason now challenges the district court's evidentiary ruling that limited Shands' testimony.

II.  Discussion

  We review the district court's decision to exclude testimony for an abuse of discretion. Palmquist v. Selvik, 111 F.3d 1332, 1339 (7th Cir. 1997). An "appellant carries a heavy burden in challenging a trial court's evidentiary rulings" because of the "special deference" a reviewing court gives them. Id. Furthermore, even if Mason meets this heavy burden, we do not reverse a jury verdict if the error is harmless; the error must have affected the party's substantial rights. See Fed. R. Civ. P. 61 (disregard errors that do not affect "substantial rights"); Fed. R. Evid. 103(a) (error must affect "a substantial right of a party"); Jones v. Lincoln Elec. Co., 188 F.3d 709, 725 (7th Cir. 1999) (citing Fed. R. Civ. P. 61 and Fed. R. Evid. 103) (reversal is required and a new trial is warranted only if error affected a party's substantial rights). The party must also have made the substance of the evidence known to the court by an offer of proof or otherwise. Fed. R. Evid. 103(a); United States v. Cleggett, 179 F.3d 1051, 1055 (7th Cir. 1999). The offer of proof (or the record elsewhere) must show "the grounds for admissibility, what the proponent expects to prove by the excluded evidence, and the significance of the excluded testimony." Cleggett, 179 F.3d at 1055; see also United States v. Vest, 116 F.3d 1179, 1189 (7th Cir. 1997).

  The law against discrimination in the workplace is well settled. Title VII provides that it "shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. sec. 2000e-2(a)(1). An employer may be liable for discrimination within the meaning of Title VII if an employee is subject to a hostile work environment based on his race. To recover, an employee must show that: 1) he was subject to unwelcome harassment; 2) the harassment was based on his race; 3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is a basis for employer liability. See Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998). The employer is essentially strictly liable if the employee's supervisor created the hostile work environment. See Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2270 (1998); Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2292-93 (1998)./4 The employer is liable for a hostile work environment created by the employee's coworkers, however, only when the employee shows that his employer has "been negligent either in discovering or remedying the harassment." Parkins, 163 F.3d at 1032.

A.  Mason's Claim

   In his reply brief, perhaps recognizing the problems with using coworker conduct to prove a claim of supervisor harassment, Mason contends that he properly presented a claim based on coworker harassment in the first place, in addition to his claim based on supervisor harassment. If so, he now contends that Shands' excluded testimony is relevant to proving the coworker aspect of his claim. The district court's accurate conclusion that Mason only presented a claim for supervisor harassment was clearly critical to its evidentiary ruling. Because Mason does not dispute this conclusion until his reply brief, this new argument is waived. See Holman v. Indiana, 211 F.3d 399, 405 n. 5 (7th Cir. 2000).

   Assuming this argument were preserved, it is of course true, as Mason notes, that Fed. R. Civ. P. 8(a) only requires a short and plain statement that will provide the defendant with fair notice of his claim. See Ryan v. Mary Immaculate Queen Ctr., 188 F.3d 857, 860 (7th Cir. 1999). But as we have noted, Mason's complaint does not fairly notify SIU that he is claiming coworker harassment. Although he attempts to magnify the meaning of paragraph twenty-three of his complaint,/5 it is not only silent on coworker conduct, but it is inextricably sandwiched

between two paragraphs specifically discussing supervisor harassment. Mason might have been able to shoehorn a claim for coworker harassment into paragraph twenty-three for purposes of surviving a motion to dismiss by alleging hypothetical facts about harassing coworkers. But even then the hypotheticals would have to be consistent with his allegations of supervisor harassment. See Holman, 211 F.3d at 405. Aside from the fact that he has produced no evidence of his being harassed by coworkers, Mason has consistently represented that he was claiming supervisor harassment. He did so during discovery, and he repeatedly testified at trial that this was indeed his claim. His one brief comment concerning his coworkers-- that while they "generally" talked to him, after he returned from his nine-month absence "sometimes" they wouldn't--is hardly sufficient, given the overwhelming thrust of his testimony, to place SIU on notice that he was (now) claiming an additional type of hostile work environment. Certainly by the time a plaintiff testifies in his case in chief, a defendant is entitled to rely on the notice that the complaint has given him when its allegations are confirmed by the plaintiff's own trial testimony. See Vidimos, Inc. v. Laser Lab Ltd., 99 F.3d 217, 222 (7th Cir. 1996). To allow Mason to introduce evidence of alleged coworker harassment via Shands' testimony would be allowing him to amend his complaint to include a new claim based on coworker harassment. See Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1428-30 (7th Cir. 1993). At this late stage of the case, the district court did not abuse its discretion in not allowing Mason to do so. Id. at 1430 (court does not abuse its discretion when it prevents unfair prejudice to defendant from admitting evidence that would inject a new claim late in the proceedings)./6

B.  Analyzing the Totality of Circumstances

As shown above, this case involves allegations of harassment by a supervisor. Yet in his initial appellate brief, Mason essentially argues that all evidence of harassment is always relevant, regardless of the type of claim the plaintiff is asserting, and that therefore all of Shands' testimony was relevant and admissible. This broad assertion is not correct.

Harassment "by co-workers differs from harassment by supervisors." Parkins, 163 F.3d at 1032. As a result, an "employer's liability for hostile environment sexual harassment depends upon whether the harasser is the victim's supervisor or merely a co-employee." Id. This same distinction applies in a racial harassment case when determining employer liability.

If a plaintiff claims that he is suffering a hostile work environment based on the conduct of coworkers and supervisors, then under the Supreme Court's totality of circumstances approach, Farragher, 118 S. Ct. at 2283 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)), all instances of harassment by all parties are relevant to proving that his environment is sufficiently severe or pervasive. See Williams v. General Motors Corp., 187 F.3d 553, 559, 562-63 & n.4 (6th Cir. 1999) (plaintiff's claim was based on the behavior of supervisors and coworkers and conduct of both types of harassers was relevant); Silk v. City of Chicago, 194 F.3d 788, 803, 806 (7th Cir. 1999) (assuming there is an ADA hostile work environment claim, actions of both coworkers and superiors are relevant to determining whether environment was severe or pervasive). Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive. Williams, 187 F.3d at 561-62.

That does not mean, however, that courts can automatically lump into the analysis of the behavior by one type of harasser behavior by a different type of harasser when the plaintiff is not pursuing a claim based on the latter's conduct. Cf. id. at 562 ("District courts are required to separate conduct by a supervisor from conduct by co-workers in order to apply the appropriate standards for employer liability."); Parkins, 163 F.3d at 1032 (liability depends on whether harassment is by supervisor or coworkers). If a plaintiff pursues a hostile work environment claim based on the behavior of a supervisor, evidence of harassment by a coworker logically must be tied somehow to the supervisor for it to be relevant and admissible. Otherwise, including such evidence could confuse the jury and prejudice the defendant. See Fed. R. Evid. 403./7 Thus, when considering the totality of the circumstances the district court here did not abuse its discretion when it limited Shands' testimony to behavior and comments attributed to Kammerer, or to those attributed to coworkers while Kammerer was present.

C. Supervisor Harassment and Shands' Excluded Testimony

Mason also argues that Shands' excluded testimony is relevant to his claim of a supervisor-created hostile work environment to show the pervasiveness of the environment or to show Kammerer's "real" motives for her ostensibly "race-neutral" treatment of him. In some "supervisor" cases, evidence of coworker behavior

might be relevant to show pervasiveness or motive. But Mason did not make these arguments until his reply brief, so they are waived. And even if he had preserved them, in this case, as we shall see, these arguments are re-packaged attempts to use incidents of coworker behavior to establish a claim that is based on supervisor harassment. Furthermore, neither Mason nor Kammerer were even present for the alleged incidents of coworker harassment that Shands' testimony would purportedly expose. Thus, Mason is trying to hold SIU strictly liable (by nominally proceeding under a claim of supervisor harassment) by using evidence of coworker harassment of which neither he nor the supervisor in question were even aware. Mason cannot bootstrap coworker behavior onto his claim of supervisor harassment.

As to pervasiveness, Mason argued to the district court that the conduct of his coworkers is relevant to some sort of derivative supervisor harassment theory under which Kammerer, through racist behavior, "sets the tone" of the department, signaling to subordinates that it is okay if they harass Mason, their coworker. Cf. Knox v. Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996) (noting possibility of a Title VII retaliation theory where a supervisor permits a plaintiff's "fellow employees to punish her for invoking her rights under Title VII"). As we understand Mason's theory of "supervisor" harassment, the actions of the coworkers are deemed to be the actions of the supervisor for which the company is then (strictly) liable. This appears to be another "bootstrapping" effort, but since Mason has failed to pursue this argument on appeal, we need not wrestle with it.

Whatever supervisor-based theory Mason might wish to employ to establish pervasiveness, there is a clear problem with using Shands' excluded evidence of coworker comments: Mason never knew of these comments. Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not "harassment" of the plaintiff (severe, pervasive, or other). Thus, for alleged incidents of racism to be relevant to showing the severity or pervasiveness of the plaintiff's hostile work environment, the plaintiff must know of them. See Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir. 1998) (racial comments made outside employee's presence did not show hostile environment); Johnson v. City of Fort Wayne, 91 F.3d 922, 938 & n.8 (7th Cir. 1996) (harassing conduct must be directed at employee in order to show racially hostile environment); see also Burnett v. Tyco Corp., 203 F.3d 980, 981 (6th Cir. 2000) (hostile actions of which plaintiff

was unaware were not relevant to her claim of a hostile work environment); Carter v. Chrysler Corp., 173 F.3d 693, 701 n.7 (8th Cir. 1999) (Plaintiff knew of graffiti "during the time in which she experienced harassment. It is thus relevant on whether a hostile work environment existed . . . ."); cf. Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 347 (7th Cir. 1999) (doubting the admissibility "of odious statements" plaintiff never heard to show racial motive)./8

Here, it is undisputed that no one ever made such comments to Mason or in his presence, and in his offer of proof, Mason's attorney did not advise the court that Shands would testify that she had ever told Mason about his coworkers' alleged use of racial epithets. Nor is it otherwise apparent from the record that Shands told Mason about them (or that he otherwise knew of them)./9 Mason's offer of proof thus failed to advise the district court of how Shands' testimony would be of significance in terms of establishing pervasiveness. United States v. Peak, 856 F.2d 825, 832 (7th Cir. 1988) ("the adequacy of [an offer of proof] is an essential prerequisite to a finding of error").

As we have said, "it is up to the party challenging exclusion to formulate an offer which satisfies all needs. One of the needs in this case was some indication" that, at a minimum, Mason was aware of these epithets. United States ex rel. Veal v. DeRobertis, 693 F.2d 642, 648 (7th Cir. 1982); see also United States v. King, 75 F.3d 1217, 1223 (7th Cir. 1996) (requiring specificity in offer of proof and rejecting "blanket" offers). Mason acknowledged at oral argument that his "counsel had an opportunity to make a full and complete offer of proof." United States v. Schroeder, 902 F.2d 1469, 1471 (10th Cir. 1990). There is no reason why he could not have offered to have Shands prove that she told Mason about the racial epithets his coworkers allegedly used when he wasn't around. Because we do not know whether Shands was in fact prepared to so testify, we cannot assess whether the exclusion was "prejudiciously erroneous." See Cleggett, 179 F.3d at 1055; King, 75 F.3d at 1223; United States v. Alden, 476 F.2d 378, 381 (7th Cir. 1973).

Mason also argues that the excluded evidence of coworker comments is relevant to show that Kammerer's racially neutral but negative treatment of him was based on his race. See Carter, 173 F.3d at 701. More specifically, it would show that Kammerer did not put a stop to Mason's coworkers' alleged racist comments because of her own racial animus. We disagree

with the relevance of such evidence here. The district court allowed into evidence anything racial that Kammerer allegedly said (even when Mason was not around), as well as anything racial that coworkers allegedly said in Kammerer's presence (again, even when Mason was not there). What Mason seeks to admit to establish Kammerer's motives are statements that coworkers allegedly made when she was not there. While evidence of coworker behavior of which the supervisor was aware might be relevant to show the supervisor's motives, Carter, supra, there has to be proof that she was aware of or that she at least had some connection to the behavior. Because Kammerer was not present on those occasions when coworkers allegedly made the comments in question, the alleged comments are not relevant to showing her motives. Cf. Hunt v. City of Markham, Ill., 219 F.3d 649, 652 (7th Cir. 2000) ("the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the decision[maker] had a discriminatory motivation"); Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000). Therefore, the district court did not abuse its discretion in excluding this evidence.

D.  Harmless Error

Assuming it was error to exclude this testimony, the exclusion did not deprive Mason of a "substantial right" (as required by Fed. R. Civ. P. 61 and Fed. R. Evid. 103(a)) in that we do not think the outcome would have been different but for the excluded testimony. Jones, 188 F.3d at 725. If Shands had attempted to testify that when neither Kammerer nor Mason were around her coworkers sometimes used racial epithets, SIU would have attempted to impeach her with her affidavit in which she swore unequivocally that at no time did she ever hear any racial epithets at SIU, including ones referring to Mason. As it stood, the jury heard Patty Shands' accounts of racial epithets in the Public Safety Department; it simply did not believe her. We doubt her credibility with the jury would have improved much once SIU cross-examined her with her unequivocally contrary affidavit.

Shands' remaining testimony was about coworkers' statements that Kammerer disliked Mason. Mason testified to this at great length. Thus, to say that this testimony would be cumulative is an understatement. The jury was already left with this impression; it just didn't believe that racial prejudice caused it. It is unlikely that excluding such cumulative evidence would have caused the jury to find differently. Palmquist, 111 F.3d at 1341 (harmless error to exclude

cumulative evidence); cf. Bankcard America, Inc. v. Universal Bancard Systems, Inc., 203 F.3d 477, 482 (7th Cir. 2000) (not plain error to admit cumulative evidence).

III.   Conclusion

   The district court did not abuse its discretion in not allowing Mason effectively to amend his complaint during the trial to present an additional claim for racial harassment based on the actions of his coworkers. Furthermore, given that Mason presented a claim for harassment based on the conduct of his supervisor, the district court did not abuse its discretion in not admitting evidence of comments that coworkers allegedly made when neither Mason nor his supervisor were present. Finally, even had the court abused its discretion in excluding this evidence, the error would have been harmless.

   For the foregoing reasons, then, the judgment of the district court in favor of the defendant is

AFFIRMED.


/1 For example, in his brief in support of his motion to compel, Mason stated that he was claiming that Kammerer was subjecting him to a hostile work environment. See Plaintiff's Memorandum Supporting His Motion To Compel Defendant To Produce Documents at 1 ("Plaintiff alleges that Kammerer repeatedly made racially harassing comments to him and about him, harassed him because of his race, and discriminated against him because of his race."); id. at 4 ("[T]he documents would be crucial for plaintiff to be able to prove that Kammerer harassed him because of his race."). As a result, the district court viewed Mason as claiming a supervisor-created hostile work environment. See Memorandum And Order (Plaintiff's Motion to Compel) at 1-2 ("Mason alleges that Kammerer repeatedly made racially harassing comments to him and about him and otherwise harassed and discriminated against him because of his race."); id. at 2 ("Mason has sued under Title VII . . . alleging that . . . Carol Kammerer racially harassed him and made racially derogatory comments to and about him.").

/2 For example, Mason testified that:

A. I believe I said [in writing to SIU's Director of Human Resources] I would like to go back to work, but I did not want to go back to work under Carol Kammerer. . . . I was expressing the fact that I wanted to work. I didn't want to be off work, but I didn't want to have to work under Carol Kammerer and [sic] aggravated, harassed,

treated unfair--. . . . Being unfair and her being racist towards me.
Q. So if Lieutenant Doan had taken over responsibilities for supervising the radio room, that would have been fine?
A. Sure. That would have been fine. The job was not the problem. Corporal Kammerer was the problem with me.

(Emphasis added.)

/3 Specifically, Shands swore in the following paragraphs of her affidavit that:

4. At no time during my employment in the Department of Public Safety at Southern Illinois University did I personally hear any police officer or supervisor in the Department of Public Safety make any racially derogatory remark.
5. At no time during my employment in the Department of Public Safety at Southern Illinois University did I personally hear any police officer or supervisor in the Department of Public Safety make any racist remark concerning Mark Mason.

/4 If the employee does not suffer a "tangible employment action" as a result of such harassment, the employer may raise an affirmative defense comprising two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly [the] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 118 S. Ct. at 2270; Farragher, 118 S. Ct. at 2293. Here, SIU has not raised the affirmative defense, and it is thus waived.

/5 "That the harassment had the effect of unreasonably interfering with Plaintiff's work performance, and creating an intimidating, hostile and offensive work environment that seriously affected the psychological well-being of the Plaintiff." Complaint, para. 23.

/6 Mason argues that SIU "was fully aware of plaintiff's claim of coworker harassment" because it did not object to a proposed jury instruction regarding coworker harassment that Mason had drafted and that the parties had submitted as part of their joint instructions. This contention was also not raised until Mason's reply brief, and to the extent he is contending that this submission implies SIU's agreement under Fed. R. Civ. P. 15(b) to amending the pleadings, we disagree. See Rosario v. Livaditis, 963 F.2d 1013, 1022 n.4 (7th Cir. 1992). SIU's repeated objections to Shands' proposed testimony as not

relevant to Mason's claim of supervisor harassment belie any notion that SIU tacitly consented to Mason bringing in at trial an additional claim based on coworker harassment. Contrast Whitaker v. T. J. Snow Co., 151 F.3d 661, 663 (7th Cir. 1998) ("Because both parties squarely addressed the strict liability theory in their summary judgment briefs, the complaint was constructively amended to include that claim.").

/7 While in Williams, upon which Mason relies, the Sixth Circuit recognized that courts must separate supervisor and coworker conduct "in order to apply the appropriate standards for employer liability," id., it stated that it is not appropriate to separate the conduct according to the type of perpetrator to determine whether the harassment is severe or pervasive. See 187 F.3d at 562 & 563 n.4. Williams is distinguishable from this case in that the plaintiff there was claiming a hostile work environment based on the actions of both supervisors and coworkers, see id. at 559, whereas Mason has pursued only a supervisor-based hostile work environment claim.

/8 We have stated, however, that with respect to a hostile work environment claim that is predicated on coworker behavior, the pervasiveness of coworker conduct could show the employer's constructive notice of the harassment (presumably even if the plaintiff is not present). Wilson v. Chrysler Corp., 172 F.3d 500, 509 (7th Cir. 1999).

/9 The only indication in the record that Mason and Shands might have discussed their coworkers' alleged comments is Mason's one-word mention during his testimony that he and Shands had talked about "discrimination." But this solitary reference is too cryptic to have apprised the district court (or us) that Shands indeed told Mason of these statements. And even if Shands told Mason about some of these comments, such "through the grapevine" or "second-hand" conduct is not sufficiently severe or pervasive so as to create a hostile work environment. See Savino v. C.P. Hall Co., 199 F.3d 925, 933 (7th Cir. 1999); Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998). And if we further assume that Shands did relay these incidents to Mason, we do not know how many times she did so; an isolated (and in this case second-hand) comment also does not create a severe or pervasive environment. See Farragher, 118 S. Ct. at 2283-84 ("offhand comments . . . will not amount to discriminatory changes in the 'terms and conditions' of employment'"); see also Ngeunjuntr, 146 F.3d at 467 (isolated racial comments did not show a severe or pervasive environment).

RIPPLE, Circuit Judge, concurring. In this case, an employee seeks to establish a case of racial harassment at the hands of a supervisor. In order to prove his case before a jury, the employee sought to establish that the supervisor made racially derogatory remarks about him before other employees and that, as a consequence of these remarks, there was a perceptible change in the manner in which his coworkers treated him. The district court admitted all behavior and statements of the supervisor and all behavior and statements of the coworkers when the supervisor was present. It refused to admit, however, behavior and statements of the coworkers when the supervisor was not present.

It is important to note what the court does not decide. The court does not decide that, as a general principle, statements made by coworkers, when the supervisor is not present, are inadmissible to prove supervisor harassment of a worker in violation of Title VII. The court recognizes that such coworker statements may be relevant in assessing the conduct of the supervisor when the circumstances support the inference that there is a causal relationship between the supervisor's statements and the behavior or statements of the coworkers. In acknowledging the relevance of such evidence, the court is recognizing the practical realities of the workplace. A supervisor ought not escape the strictures of Title VII when she sets the stage for the harassment of a worker and then simply absents herself when the actual harassment takes place.

As my colleagues note, in proving supervisor harassment, evidence of coworker behavior can be relevant to establish the motive of the supervisor. In order to establish the necessary link to the supervisor, however, it is necessary to show, by direct or circumstantial evidence, that the supervisor was aware, or should have been aware, that her actions or words would lead to the behavior and words of the coworkers. To establish a supervisor's motive through the words and actions of the coworkers, it is necessary to show that the supervisor should have realized that her activity would lead to such a result. Here, the employee wished to show that, after the supervisor made racially derogatory comments in the presence of coworkers, there was a substantial increase in racial epithets in the

coworkers' parlance and that he was isolated by those workers in the daily activities of the workplace. My colleagues believe that the district court was on solid ground in declining to admit the evidence of the coworker's statement because there is no evidence that the supervisor was present when the statements were made. It is not clear, however, why the supervisor's presence is necessary to establish the relevance of the statements to the issue of the supervisor's intent. The defense wanted to establish that, in making racially charged statements in front of the coworkers, the supervisor was sending a signal that treating the plaintiff in a racially discriminatory matter was acceptable conduct in which the workers could indulge safely without fear of reprisal--a message confirmed when a coworker did make such a statement before the supervisor and incurred no sanction.

The actions and statements of the coworkers also can be relevant, as my colleagues also acknowledge, on the issue of whether the harassment was pervasive. Here again, the employee was entitled to show that the supervisor's statements to the coworkers signaled that the supervisor condoned, or even encouraged, the racial harassment of the employee.

My colleagues suggest, however, that the remarks of the coworkers are irrelevant on both the intent issue and on the pervasiveness issue because the employee never knew of the comments. The majority is certainly correct in stating that mean-spirited or derogatory behavior of which the plaintiff is unaware and therefore never experiences are not, in themselves, "harassment." But, even if these statements were not, in themselves, instances of harassment, their occurrence can certainly be relevant for the limited purposes of showing the intent of the supervisor in making the statements and to demonstrate that the statements that were heard by the employee were the products of an intense and concerted effort to set the employee apart from his fellow workers on the basis of his race.

Although the tendered evidence was relevant, the decision of the district court not to admit it in this case must be sustained. For the reasons given by my colleagues, the failure to admit this material must be considered harmless error.

On this basis, I join the judgment of the court.