Nathaniel **HENDERSON**, Plaintiff,

v.

**IRVING MATERIALS, INC., d/b/a Southside Ready Mix Concrete, Inc., Reed Moistner, Jr., and Mitchell Santerre, Individually and as Agents, Servants, and/or Employees of Irving Materials, Inc. d/b/a Southside Ready Mix Concrete, Inc., Defendants.**

**No. IP02–CV–1292–DFH–VSS.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Aug. 4, 2004.

Denise H. LaRue, Haskin Lauter & LaRue, Indianapolis, IN, for Plaintiff.

Paul H. Sinclair, Ice Miller, Indianapolis, IN, for Defendants.

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

This Title VII case alleging a racially hostile environment is before the court on defendants' motion for summary judgment. Plaintiff Nathaniel Henderson was the first and only black person hired to work for Irving Materials, Inc. as a concrete truck driver in its Harding Street Plant in Indianapolis. Irving Materials does business as "SouthSide Ready Mix Concrete, Inc.," and the court refers to the defendant here as "SouthSide." Henderson alleges that from April 2001 to early 2002, he endured continuous and relentless harassing behavior aimed at him because of his race. The principal wrongdoers, according to Henderson, were defendants Reed Moistner and Mitchell Santerre, who worked with him. Henderson testified that he complained to his immediate supervisor, Willie Taylor, about a number of the incidents. Henderson's evidence also indicates that Taylor was actually present for many of the alleged incidents. Henderson also testified that he complained to Gordon Goins, the general manager for SouthSide, about several of the incidents.

Henderson has sued SouthSide and Moistner and Santerre, individually and as agents, servants, and/or employees of SouthSide. Henderson has alleged that the defendants violated Title VII of the Civil Rights Act of 1964 by creating and tolerating a hostile work environment, and that they retaliated against him and violated his rights under state law.

Defendants have moved for summary judgment, contending that most of the incidents alleged by plaintiff were not based on race, and that the allegedly hostile work environment was neither severe nor pervasive. Defendants further argue that plaintiff has not presented evidence sufficient to convince a reasonable jury that the employer should be held liable for harassment by co-workers. As explained below, defendants' motion for summary judgment is granted in part and denied in part. With respect to the individual defendants and to plaintiff's retaliation and state law claims, defendants' motion is granted. As to the central hostile work environment claim against SouthSide, defendants' motion is denied.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment, and "material facts" are defined as those that might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists only if there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

On a motion for summary judgment, the moving party must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which the party believes demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As required when deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to plaintiff Henderson, the non-moving party. See Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Baron v. City of Highland Park,* 195 F.3d 333, 337–38 (7th Cir.1999). However, the existence of some metaphysical doubt does not create a genuine issue of fact. "A party must present more than mere speculation or conjecture to defeat a summary judgment motion." *Sybron Transition Corp. v. Security Ins. Co. of Hartford,* 107 F.3d 1250, 1255 (7th Cir.1997). The court should neither "look the other way" to ignore genuine issues of material fact, nor "strain to find" material factual issues where there are none. *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1363–64 (7th Cir.1988).

Where the moving party has met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Local Rule 56.1 requires the party opposing a motion for summary judgment to identify specific and material factual disputes. In employment discrimination cases, as in any case, courts weighing summary judgment motions must take care not to invade the province of the fact finder. At the same time, employment cases are governed by the same rules that govern other summary judgment cases. They are equally amenable to summary disposition if there is no genuine dispute as to material facts. *Gonzalez v. Ingersoll Milling Mach. Co.,* 133 F.3d 1025, 1031 (7th Cir.1998), citing *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir.1997).

### Disputed and Undisputed Facts

With these standards in mind, the following facts are either undisputed or reflect the evidence in the light most favorable to plaintiff Henderson, the non-moving party. See, *e.g., Schwartz v. State Farm Mut. Auto. Ins. Co.,* 174 F.3d 875, 878 (7th Cir.1999). All reasonable inferences have been drawn in his favor. The court does not vouch for the truth or accuracy of these facts, but defendants have chosen to contest the case on the basis of plaintiff's account of the facts.

Plaintiff Nathaniel Henderson, an African American, began working for SouthSide on April 9, 2001 as a concrete truck driver. Henderson was assigned to work at the Harding Street Plant in Indianapolis, Indiana. He was the first and only black person hired by SouthSide. Henderson's immediate supervisor was Willie Taylor, the plant manager for the Harding Street Plant.

Defendant Mitchell Santerre began working for SouthSide in 1987. Defendant Reed Moistner began working for SouthSide on April 27, 2001. Both defendants are white males and both worked with Henderson at the Harding Street Plant during the time in question.

Plant manager Taylor's office was right next to the employee break room. The two rooms were separated by a wall with a window opening. Taylor would fraternize with employees in the break room. From

his office, Taylor would also speak to employees and distribute work papers to them through the open window. Pl. Aff. ¶ 6–8.

Beginning in April 2001, Henderson heard Moistner telling racist jokes to coworkers, including Santerre. Pl. Dep. at 46. These episodes occurred in the employee break room on a regular basis, as much as nine times per month. Id. at 51. In these jokes, Moistner would use the terms "black," "nigger," "coon," and "spook." Id. at 49. Henderson protested several times and told Moistner directly that he "didn't care to hear that mess." Id. at 52. To no avail. The jokes continued until November when Moistner was transferred to a different facility. Plant manager Taylor was present when Moistner told racially disparaging jokes and when Henderson protested, and Taylor even laughed at the jokes himself. Pl. Aff. ¶ 12.

As a truck driver for SouthSide, Henderson wore a uniform with his name on it. He kept some of his uniforms at work. In September or October 2001, someone cut the buttons off of several of his uniform work shirts. Pl. Dep. at 165.

In September or October 2001, Santerre approached Henderson in the employee break room. He told Henderson that no one wanted Henderson working there and that Henderson should get another job. Id. at 40. Moistner was present, as was plant manager Taylor. Id. at 38.

Toward the beginning of October 2001 on a Saturday morning, Henderson found that his work truck had been vandalized. He was the only person at the plant assigned to drive that particular truck. Someone had put grease on the handle he used to get into the truck, on the inside knobs, on the water hose, on the back and bottom of his seat, and on several other places he routinely used to operate the truck. Pl. Dep. at 15. Henderson reported this incident to plant manager Taylor the following Monday. Id. at 22.

Starting in October and continuing into November, Moistner began to insinuate to Henderson that Moistner belonged to the Ku Klux Klan. Id. at 25. In November 2001, while Henderson was in the employee break room, Moistner stated that he was going to renew his membership in the KKK and that he knew the grand dragon of the KKK. Id. at 61. Moistner said this in a conversation with Santerre and another person. Plant manager Taylor heard the comment. Id. at 62–63. When Henderson asked Moistner whether he had actually been in the KKK, plant manager Taylor corrected Henderson's use of the past tense, saying that Moistner was still a member of the KKK. Id. at 65.

In October 2001, Moistner, Santerre and another person were in the employee break room having a conversation in which Santerre or the other person mentioned Henderson's name. Moistner responded: "I'd like to drag him ... down the street on the back of my pick-up truck." Pl. Dep. at 70, 72. Moistner then spoke to Henderson directly and told Henderson to come out to the field in the back of the plant for a fight. Henderson told Moistner that he did not have time for Moistner's "mess." Plant manager Taylor heard the exchange. Id. at 75–77. Although Moistner did not refer to Henderson by name initially, he made the explosive "dragging" statement in Henderson's presence and so that he could hear. A jury could easily infer that Henderson was the intended target of Moistner's threat.

In November 2001, Henderson's truck was parked in the parking lot at the plant and Henderson was climbing down the ladder on the side of the truck. Santerre

drove through the parking lot at a high rate of speed and attempted to hit Henderson. Henderson reported the incident to plant manager Taylor, who said he would have a talk with Santerre. Santerre did this once more while Henderson was working at the Harding Street Plant. Pl. Dep. at 201–03.

Also in November 2001, Henderson began to notice an odor as he was driving his truck that he thought was coming from somewhere inside the truck. *Id.* at 85. The smell persisted for a week. As Henderson was driving his truck on November 15th, a dead mouse fell into his lap. *Id.* at 80. Upon further inspection, Henderson found three more dead mice wrapped in napkins that had been planted in his truck. *Id.* at 80, 82. Henderson reported the incident to plant manager Taylor, who removed one other dead mouse from Henderson's truck. *Id.* at 80. Henderson's co-workers laughed at him when they realized he had discovered that the dead mice were the source of the odor. *Id.* at 87. Shortly before this incident, Henderson had recorded Santerre on audio tape in the employee break room picking up a dead mouse from a mouse trap in the room and saying to the mouse "Don't you worry about a thing, I've got a home for you." Santerre then walked out of the break room carrying the mouse. *Id.* at 89. Santerre had done the same thing with a dead mouse on the previous day as well. *Id.* at 90.

According to Henderson, this was the last that he could take. He immediately complained to plant manager Taylor about the dead mice. In response, the company posted a sign at the plant to remind the drivers to keep their trucks clean to keep mice away. Goins Aff. ¶ 12. The sign also stated "Do not expose any other employee to rodents." *Id.*, Ex. A. On November 21, 2001, Henderson sent a letter of complaint to Goins, the general manager for South-Side. Goins Aff. ¶ 13. In his complaint, Henderson listed incidents that he thought contributed to the hostile working environment, including the dead mice, Santerre's comment that no one wanted to work with him, the buttons cut from his work shirt, grease put on the inside of his truck, Moistner's comments about the KKK, and Moistner's expressed wish to drag Henderson from the back of his pick-up truck. Pl. Dep., Ex. 9.

On November 26th, Henderson met with general manager Goins. Pl. Dep. at 181. At that meeting, Henderson complained of numerous other incidents, including Moistner's racially inappropriate jokes and comments and Santerre's picking up dead mice in the employee break room. *Id.* at 55–56, 188–89. On November 27, 2001, Goins issued a written warning to Moistner and to Santerre. Each warning restated Henderson's allegations with respect to each of the two individually and stated: "I am perplexed that such activity has gone on since June of 2001, without my knowledge. I am appalled by such destructive and violent behavior." Def. Ex. 12. Goins also transferred Moistner to the Southport plant. Goins Aff. ¶ 17.

Just two days later, on November 29, 2001, Goins wrote letters to Moistner and to Santerre rescinding his reprimands and apologizing to both for overreacting. Goins stated in his letter, two days after his initial reprimands for months' worth of alleged harassment, that he was unable to substantiate Henderson's complaints against them both. Def. Ex. 12.

In December 2001, Moistner and Santerre filed claims against Henderson in a small claims court stemming from Henderson's accusations against them. At some point after the claims were filed, Henderson and Moistner were at the small claims court when Moistner called

Henderson a "f* * *ing nigger." Pl. Dep. at 59–60. Moistner later told Henderson that Moistner himself had reported the incident to Goins, who told Moistner to apologize to Henderson. Moistner did apologize to Henderson for the incident. *Id.* at 96.

In March 2002, SouthSide, against Henderson's wishes, transferred Henderson to its Pittsboro Plant in Noblesville, Indiana. Pl. Dep. at 234. Henderson's job duties and benefits package remained the same. *Id.* at 250. His pay increased. *Id.* at 294.

### Discussion

#### I. Abandoned Claims

In his reply to defendants' motion for summary judgment, Henderson abandoned his Title VII retaliation claim and all state law claims. As a result, defendants' motion for summary judgment is granted as to these claims. The remaining claim is plaintiff's Title VII hostile work environment claim.

#### II. Individual Defendants

■ Defendants contend that Moistner and Santerre are not proper defendants under Title VII of the Civil Rights Act of 1964 because they were not Henderson's "employer" within the meaning of the act. The court must agree. The Seventh Circuit has held that individual employees cannot be personally liable under Title VII. *Gastineau v. Fleet Mortgage Corp.,* 137 F.3d 490, 494 (7th Cir.1998), citing *Williams v. Banning,* 72 F.3d 552 (7th Cir.1995). The court therefore grants defendants' motion for summary judgment as to Moistner and Santerre individually.

#### III. Hostile Work Environment

■ To survive summary judgment on his hostile work environment claim against SouthSide, Henderson must come forward with evidence that would allow a reasonable jury to find that: (a) he was subject to unwelcome harassment; (b) the harassment was based on his race; (c) the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and to create a hostile or abusive working environment; and (d) there is a basis for employer liability. *Mason v. Southern Illinois Univ. at Carbondale,* 233 F.3d 1036, 1043 (7th Cir.2000). Under Title VII, a hostile work environment exists when conduct is so severe or pervasive that it is objectively hostile and the victim himself finds it abusive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ The Seventh Circuit has often made clear that hostile work environment claims do not require proof of tangible psychological injury, but instead require proof that goes beyond evidence of an uncomfortable or "merely offensive" work environment. See, *e.g., Cerros v. Steel Technologies, Inc.,* 288 F.3d 1040, 1046 (7th Cir.2002). A work environment is actionable if the harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment and creates an abusive working environment. *Id.; Silk v. City of Chicago,* 194 F.3d 788, 804 (7th Cir.1999).

Many of the incidents alleged in this case, when taken alone, would not be sufficient by themselves to reach the "severe or pervasive" standard required to support a hostile work environment claim. See, *e.g., Salvadori v. Franklin Sch. Dist.,* 293 F.3d 989, 997 (7th Cir.2002); *Drake v. 3M,* 134 F.3d 878, 883–86 (7th Cir.1998). However, the court must consider the totality of the relevant circumstances. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. The court may not consider each incident in isolation. Instead, the court must consider each as part of a larger quilt of racial hostility that

could convince a reasonable jury that the conditions of Henderson's employment were materially altered by a racially hostile work environment.

### A. *Target of Unwelcome Harassment*

The undisputed facts easily support a finding that Henderson was the target of unwelcome harassment, thus satisfying the first required element of his claim.

### B. *"Based on" Race*

■ There also is no dispute that plaintiff's evidence of Moistner's racial jokes and comments, Moistner's claims to be a member of the Ku Klux Klan and to know the Klan's grand dragon, and Moistner's calling Henderson a "nigger" at the small claims court were racial incidents and stemmed directly from racial hostility. As for the remainder of the incidents alleged by plaintiff, the racial connection might appear more attenuated if the incidents were considered in isolation. However, the court may not view those incidents in isolation. See *Cerros*, 288 F.3d at 1046 (reversing summary judgment for employer in racially hostile environment case where district court had failed to consider multiple incidents in their entirety). Viewing the other acts of harassment by Moistner and Santerre, tolerated by plant manager Taylor, in combination with the incidents involving the more blatant racial hostility, a reasonable jury could find that all were part of a racially hostile environment.

Defendants argue that some incidents were not based on race because there was not an explicit racial dimension. Defendants' argument is easily refuted with respect to one incident in particular, the evidence that Moistner threatened to drag Henderson behind his pick-up truck. The court must keep in mind the Seventh Circuit's and Supreme Court's instructions to give careful consideration to "the social context in which particular behavior occurs and is experienced by its target," *Cerros*, 288 F.3d at 1046, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), and to keep in mind that "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships...." *Id.*, quoting *Oncale*, 523 U.S. at 82, 118 S.Ct. 998; see also *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.") (citations omitted).

Defendants' contention that a threat to drag Henderson behind a pick-up truck was devoid of a racial element is blind to history. See Def. Br. at 17. In a murder that gained worldwide attention in 1998, James Byrd, a black man, was chained to the back of a pick-up truck by three white men who drove through the streets of Jasper, Texas, dragging Byrd to his death. See Dina Temple–Raston, *A Death in Texas* (2002); Richard Stewart, *Dragged Into Infamy*, Houston Chronicle, Jan. 24, 1999, at A1; see generally Alan Pergament, *PBS Documentary Details Texas Town's Race Relations*, Buffalo News, Jan. 21, 2003, at D1 (discussing documentary film on Byrd murder showing racial differences in Jasper's perceptions of murder). The murder of Mr. Byrd triggered images of similar past acts of lynching, a tactic used

by whites to terrorize and kill members of the black community.

The threat by Moistner, a self-proclaimed member of the Ku Klux Klan, that he "would like" to drag Henderson, a black man, down the street on the back of Moistner's pick-up truck has racial connotations that date back to the days when lynching black people in this manner was commonplace. See Brent Staples, *Coming to Grips with the Unthinkable in Tulsa,* New York Times, Mar. 16, 2003, sec. 4, p. 12, col. 1 (discussing race riot in Tulsa, Oklahoma where black people were "shot, burned, lynched or tied to cars and dragged to death"); Tim Madigan, *The Burning* 121, 148 (2001) (discussing corpses of black people being dragged behind cars by whites as "macabre trophies" and describing in graphic detail a black man being dragged to death behind the car of white men); Stewart, *Dragged Into Infamy,* at A1 ("Byrd had been dragged to death—a horribly brutal means of killing that had been suffered by black men at the hands of whites in the rural South earlier in the century, the horse giving way to the car or truck. It touched a racial nerve across the country."); Jack Schnedler, *Memoir Evokes Women's Zeal,* Arkansas Democrat–Gazette, Sept. 27, 1998, at J6 (reviewing a book with mention of the 1927 lynching of a black man in Little Rock, Arkansas who was tied to the back of a car and dragged down the street); Jacquelyn Brown, *Parade's Grand Marshals Recall Pre–King Era,* Knoxville News–Sentinel, Jan. 13, 1995, at A4 (recalling man "lynched and dragged through town behind a car as a warning to other blacks."); Arthur F. Raper, *Mass Violence in America: The Tragedy of Lynching* 7, 237, 326–27, 359 (Arno Press & the New York Times 1969) (1933) (describing several lynchings of black men by white mobs that culminated in the lynched individual's body being dragged behind a vehicle). A jury could easily find that Moistner's threat carried as much racist freight as the most vile racial epithets (which Moistner himself also aimed at Henderson), combined with a threat of murder.

A reasonable jury could also draw the reasonable inference that, in light of the explicit racist character of several incidents, the superficially neutral acts of harassment were also all based on race. These forms of harassment include the buttons cut from Henderson's work shirt, the grease slathered inside his truck, the dead mice placed in his truck, the "no one wants you here" comment by Santerre, and Santerre's attempts to hit or frighten Henderson with his truck. The alleged wrongful conduct "need not have been explicitly ... racial in order to create a hostile environment.... The complained of conduct must have [a] ... racial character *or purpose* to support a Title VII claim." *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir.1999) (emphasis in original). Plaintiff has set forth sufficient evidence to convince a reasonable jury that the conduct that defendants characterize as not based on race did indeed have a racial purpose and/or character.

### C. *"Severe or Pervasive"*

■ The next issue is whether the conduct was sufficiently severe or pervasive to support a claim under Title VII. "For workplace conduct to constitute a hostile work environment actionable under Title VII, the harassment must be sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive environment." *Tutman v. WBBM–TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1048 (7th Cir.2000) (citations omitted). Whether a hostile work environment exists is a mixed question of law and fact reviewed for clear error. *Rodgers v. West-*

ern–Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir.1993) (affirming finding of racially hostile environment and accompanying damage award). To be considered severe or pervasive, the conduct must have been objectively hostile or abusive and must have been subjectively perceived as such. Harris, 510 U.S. at 21–22, 114 S.Ct. 367. "[I]solated and innocuous incidents will not support a hostile environment claim." McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 480 (7th Cir.1996); see also Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 533 (7th Cir.1993) (" 'relatively isolated' instances of misconduct that [are] not severe will not support a hostile environment claim").

The jury could easily find that Henderson subjectively perceived his work environment to be hostile and abusive. He complained to plant manager Taylor on several occasions. He submitted a detailed letter of complaint to general manager Goins and met with Goins to discuss the incidents that he believed made his work environment intolerable. Henderson also directly told Moistner that he did not appreciate Moistner's racist jokes and comments.

■ To ascertain whether an environment is objectively hostile or abusive, the court must consider all the circumstances, including the frequency of the discriminatory conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether that conduct unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23, 114 S.Ct. 367; Cerros, 288 F.3d at 1046. In other words, a court must consider the totality of the circumstances, rather than merely considering incidents separately and independently of one another. Murray v. Chicago Transit Auth., 252

F.3d 880, 889 (7th Cir.2001); Mason, 233 F.3d at 1044–45.

■ Applying this standard, plaintiff Henderson's claims are sufficient to survive summary judgment on a hostile work environment claim. See, e.g., Cerros, 288 F.3d at 1046–47 (reversing summary judgment where plaintiff suffered extensive verbal and other forms of harassment based on ethnicity); accord, White v. BFI Waste Services, LLC, 375 F.3d 288, 297–98 (4th Cir.2004) (reversing summary judgments for employers where black employees were called racially derogatory names and were subjected to racially explicit terms of ridicule and opinion); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1118 (9th Cir.2004) (reversing summary judgment for white plaintiff whose workplace was "polluted" when he was harassed for making friendships that crossed racial lines); Terry v. Ashcroft, 336 F.3d 128, 149–50 (2d Cir.2003) (reversing summary judgment where plaintiff employee's supervisors "purposely harassed" him and made his "life hell on Earth"); Hawkins v. Groot Indus., Inc., 2003 WL 1720069, at *2, 2003 U.S. Dist. LEXIS 5051, at *7–13 (N.D.Ill. Mar. 31, 2003) (several harassing comments by supervisors and co-workers enough for plaintiff to survive summary judgment on hostile work environment claim). Defendants, by characterizing the evidence as "rather tepid events," Def. Br. at 18, "tired reasoning," Reply Br. at 7, "industrial plant banter," Def. Br. at 21, and "teasing," Def. Br. at 21, ask the court to close its eyes to the totality of the evidence and to "the social context in which particular behavior occurs and is experienced by its target," and to the "real social impact of workplace behavior." Cerros, 288 F.3d at 1046 (citations omitted).

Defendants seek to compare Henderson's allegations to those that the Seventh Circuit has rejected in several

cases. See, *e.g., Logan v. Kautex Textron N. Am.,* 259 F.3d 635, 641 (7th Cir.2001); *McPhaul v. Madison County Bd. of Comm'rs,* 226 F.3d 558 (7th Cir.2000); *Adusumilli v. City of Chicago,* 164 F.3d 353 (7th Cir.1998). Such cases are easily distinguishable in terms of severity. In *Logan,* the plaintiff's co-worker expressed his view that "interracial relationships were disgusting," that blacks caught in a particular area of town "could get lynched," and that if plaintiff wanted to keep her job, she had better "get along with him." 259 F.3d at 638. The offensive comments by plaintiff's co-worker in *Logan* were indirect and were relatively few in number. *McPhaul* was a § 1983 case in which plaintiff alleged that her supervisor told her of racially derogatory statements made to the supervisor by a client, repeated to plaintiff another comment the supervisor had overheard about a dark-skinned lady having a lighter-skinned baby, and told plaintiff that the supervisor's family had been harassed by the KKK. In *McPhaul,* the incidents were "second hand" and indicated the supervisor's "immaturity and insensitivity" rather than any "racial animus." 226 F.3d at 567. *Adusumilli* was a sexual harassment case in which the plaintiff had evidence of only teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks. The Seventh Circuit affirmed summary judgment because the environment was not sufficiently severe or pervasive to be actionable. 164 F.3d at 361.

The treatment of the plaintiffs in *McPhaul, Logan,* and *Adusumilli* cannot compare in magnitude to the things said and done to Henderson in this case, according to his evidence. For instance, a jury could easily find that a co-worker's general statement that black people could get lynched in a certain part of town is qualitatively different from a co-worker's indication (in the pick-up truck comment) that he personally, as a member of the KKK, supported the idea of lynching or otherwise harming this African–American plaintiff solely because of race.

Defendants also contend that the incidents alleged by plaintiff cannot satisfy the pervasive arm of the "severe or pervasive" test because no specific incident occurred more than once. The argument is specious. The plaintiff need not show that the alleged conduct was both severe *and* pervasive; either is sufficient. *Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir.1999). Further, the incidents alleged in this case were not isolated incidents. Every incident must be considered in combination with the other incidents. There also is no principle of law requiring the harassers to repeat any particular form of harassment. If we are counting, as defendants suggest, there were a total of at least nine incidents in September and October 2001 alone. A reasonable jury considering the totality of the circumstances in this case could find that the hostile work environment was sufficiently severe and pervasive and that plaintiff worked in a racially abusive environment so severe as to alter the terms and conditions of his employment.

Further, although Henderson did not lose his job, proof of termination is not dispositive on the question of severe or pervasive. See *White v. BFI Services,* 375 F.3d at 298 n. 6 ("One need not sacrifice one's job (and a steady source of income) in order to prove that racial harassment in the workplace rose to the level of an actionable hostile work environment.").

### 1. *"Second Hand Harassment"*

More specifically, defendants argue that plaintiff was not directly subjected to

Moistner's racial jokes and/or comments, so that Henderson cannot claim that his work environment was hostile or abusive. For this "second hand harassment" theory, defendants cite *McPhaul,* 226 F.3d at 567. However, when considering the totality of the evidence, a reasonable jury could find that the racial jokes and comments were directed toward Henderson, and that Moistner intended for Henderson to hear the jokes and comments so that Henderson would understand that he was not welcome on the job because of his race.

When one views the totality of the evidence, a jury could easily find that these jokes and other statements were made deliberately in Henderson's presence and were aimed at him. The jury could also find that the repeated racially derogatory jokes and comments had an impact on Henderson's subjective perception of his work environment and would have had an impact on the work environment of any reasonable person in Henderson's shoes. See *Adusumilli,* 164 F.3d at 361 (objectively hostile work environment is one that a reasonable person would consider hostile or abusive).[1]

Defendants also assert this "second hand harassment" argument with respect to Moistner's comment that he would like to drag Henderson from the back of his pickup truck. The argument cannot prevail on summary judgment. In his deposition testimony, Henderson testified as follows:

Q: Did he just walk up to you and make this statement?

A: No. He didn't make the statement to me. He made the statement to someone else in the break room. And he said he would like to drag— he said, I'd like to drag him in the back of the—drag him in the back of my pickup truck down the street, on the back of his pickup truck.

\* \* \* \* \* \*

Q: In your description of the event, he did not use a specific name. So I assume that he didn't specifically say he wanted to drag you behind the truck?

A: Well, someone else—I think someone else was saying something about me, and the conversation was directed towards me. And yes, he was talking about me.

\* \* \* \* \* \*

Q: What were [the other persons] saying about you?

A: Well, I mean, they said something— they said something to him, and he said, I'd like to drag him out—drag him out on the—down the street on the back of my pickup truck.

\* \* \* \* \* \*

Q: And you get that because of the context of what someone else said?

A: Because the conversation was directed towards me. My name came up in that conversation. Someone said something to Reed [Moistner], and they used my name. And he said—Reed responded to that person, I would like to drag him down the road. That's how I knew that

<hr>

1. Even if this court were to accept defendants' "second hand harassment" theory, the court in *McPhaul* said: "When such harassment is directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plain-

tiff." *Id.* at 567. The court did not say that such conduct had no impact at all, and such conduct should be considered as part of the totality of the circumstances when there is a more extensive campaign of racial harassment.

the conversation was directed towards me.

Pl. Dep. at 70–74.

As with the racial jokes and comments, a reasonable jury could find that Moistner's vicious "dragging" comment was aimed directly at Henderson. According to plaintiff, Moistner's immediate response to hearing Henderson's name was to make the pick-up truck comment. The comment was racially inflammatory and could easily be interpreted as an unveiled threat of physical violence. A reasonable jury could conclude that the comment was not second hand because it came straight out of the mouth of Moistner and bore his ideology and hatred. It was thus much more than a co-worker's insensitive repeating of a comment that happened to be racially offensive.

### 2. *Buttons and Grease*

Henderson testified that someone at the plant cut the buttons off his work shirt and spread grease on several different parts of his truck. In his deposition, he testified that he told general manager Goins he did not believe either incident to be racial. Pl. Dep. at 187–88. Plaintiff testified that those incidents were in September and October 2001. As time wore on and Henderson's co-workers made their feelings for him plain, plaintiff came to believe, as a reasonable jury also could, that his initial impression, that the incidents were merely the workings of an immature prankster, was wrong. The evidence Henderson submits in support of that changed view includes Moistner's claim to be a part of the KKK in November 2001 and finding the dead mice in his truck, also in November. A reasonable jury could consider these incidents in the totality of the circumstances and conclude that Henderson endured a hostile work environment.

### 3. *Santerre*

Henderson alleges that twice during the time that he worked at the Harding Street Plant, defendant Santerre drove his truck very fast through the parking lot of the plant and drove very close to Henderson as though trying to hit him. Pl. Dep. at 201–03. Defendants argue that perhaps Santerre only likes to drive fast. They can make that argument to a jury. Plaintiff testified in his deposition that Santerre did this twice, and that he saw Santerre's face as he was driving. Additionally, according to Henderson, Santerre was an active and willing participant during Moistner's lewd, inappropriate and distasteful racial jokes and comments. Santerre had told Henderson, apparently intending to speak for himself and others, that no one wanted Henderson working there. Again, considering the totality of the circumstances, Henderson has presented sufficient evidence to allow a reasonable jury to infer that Santerre was at the very least trying to intimidate him by driving his cement truck so fast and so close to him, and that Santerre was motivated by Henderson's race in doing so.

This incident is evidence that could convince a reasonable jury that Henderson endured a work environment where he eventually, and reasonably, came to fear for his physical safety. Even though such fear is not *required* to show that a hostile work environment existed, *Harris*, 510 U.S. at 22, 114 S.Ct. 367, it is certainly important evidence at summary judgment in showing at the very least a genuine dispute of material fact as to whether plaintiff endured a hostile work environment.

### 4. *KKK*

Defendants argue that the conversation between Moistner and Henderson about

Moistner's membership in the KKK was not only initiated by Henderson, but that Henderson testified in his deposition that he thought Moistner was joking at the time. Plaintiff testified as follows:

Q: And he was making that comment to one of your coworkers, Mitch Santerre or someone else?

A: Yes.

\* \* \* \* \* \*

Q: Who else heard him say it?

A: I mean, several people, the plant manager heard him say it.

Q: And is that Willie Taylor again?

A: Yes. Willie Taylor heard him say it. As a matter of fact, Willie Taylor even commented one time because I had asked him—I think I had asked him—I said—I think I had asked him, Are you—was you really in the Ku Klux Klan? ... I asked Reed [Moistner] that. I said, Was you really in the Ku Klux Klan? And the plant manager said, Willie Taylor said, What do you mean was? He still is in the Ku Klux Klan.

\* \* \* \* \* \*

Q: So he says, I need to make sure to renew my membership in the Ku Klux Klan -

A: He said, I want to make sure that I renew my membership in the Ku Klux Klan. And I paused for a little bit, and I said, Were you—Are you really in the Ku Klux Klan, or, Were you really in the Ku Klux Klan? And Willie Taylor said, What do you mean was? He still is.

Pl. Dep. at 62–63, 65.

Based on this testimony, Henderson no more initiated that line of conversation than if he had said nothing at all. And regardless of who initiated the conversation, a reasonable jury could find Moist-ner's comments troubling, especially given the KKK's history of violent attacks on African Americans. See Stewart E. Tolnay & E.M. Beck, *A Festival of Violence: An Analysis of Southern Lynchings, 1882–1930* at 6 (1995). The facts that Moistner was telling Henderson that he was going to renew his membership and that Taylor was corroborating Moistner's membership imply at worst violent intentions toward Henderson, the lone black person at the plant, and at best a passionate dislike for Henderson, all because of his race. Who started the conversation is not material to the disturbing substance of the conversation.

Whether Henderson thought Moistner was joking about being a member of the KKK is also irrelevant for the reasons stated above. The KKK has a long and bloody history of violence and aggression toward African Americans and others, based on race, religion, ethnicity, and national origin. Moistner's actual membership or actual intent to renew his membership in the KKK is therefore not the point. The hostile atmosphere was created by the contents and implications of the statements. In any case, plaintiff Henderson testified that when Moistner first began to talk about the KKK, Henderson was not sure whether he was joking. Eventually, however, Henderson came to believe that Moistner was "very serious." Pl. Dep. at 68. Defendants may, if they wish, try to portray the conversation as a joke before the jury, but it cannot be dismissed so lightly on summary judgment.

### 5. Dead Mice

Plaintiff testified that in November 2001, he found several dead mice in his truck. Plaintiff discovered the mice after suspecting for days that, by the smell of things, something had died somewhere in his truck. The mice were wrapped in napkins

and must have been placed in a console in Henderson's truck. Pl. Dep. at 82, 88. Henderson's co-workers laughed when he finally discovered the dead rodents. Plaintiff testified that this was the final act that he could endure. He simply could take no more. The evidence is sufficient to allow a reasonable jury to find that Henderson's discovery of the dead mice contributed significantly to a hostile work environment. A reasonable jury could find that the dead mice were more than a harmless prank and were part of a larger campaign of racial hostility toward Henderson.

### 6. Small Claims Court

Finally, Henderson alleges that Moistner called him a "f* * *ing nigger" at the small claims court in December 2001. The Seventh Circuit has held that use of the word "nigger" is inherently racially hostile. *Rodgers*, 12 F.3d at 675. It is of little consequence in this case that the incident occurred away from the job site. Henderson and Moistner were co-workers and general manager Goins was made aware of the incident when Moistner informed him of it. Pl. Dep. at 57. In any event, Henderson alleges that Moistner also used the term on the job when he regaled his colleagues and the plant manager with his racially offensive jokes and comments.

In sum, all of the alleged incidents must be considered as a whole when analyzing Henderson's hostile work environment claim. Considering the totality of the circumstances, and giving Henderson the benefit of all reasonable inferences from the evidence, the incidents alleged are sufficient to allow a reasonable jury to find that plaintiff Henderson's work environment was severe, pervasive, and abusive, and was therefore actionable under Title VII.

### D. Employer Liability

Once a Title VII plaintiff establishes that his work environment was both subjectively and objectively hostile, he must also establish a basis for employer liability. To establish employer liability where the harasser is a co-worker, plaintiff must show that the employer was negligent in either discovering or remedying the harassment. See *Mason*, 233 F.3d at 1043; *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 320 (7th Cir.1992). In hostile work environment cases, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir.2000). Generally, the law does not charge an employer with knowledge of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir.2004), citing *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir.1999). If the harassment was sufficiently obvious, however, an employer can be charged with constructive notice. *Mason*, 233 F.3d at 1046 n. 8.

Defendants argue that plaintiff did not report to management several incidents, including Moistner's comment that he intended to renew his membership in the KKK, Moistner's racial jokes, and Moistner calling Henderson a "nigger" at the small claims court. However, plaintiff's evidence could convince a reasonable jury that Henderson's supervisor, plant manager Willie Taylor, was present and witnessed many of Moistner's racist jokes and comments, as well as his KKK membership renewal comment. There is no evidence that there was any company policy directing employees to report com-

plaints to anyone other than Taylor, a supervisor with an actual presence at the plant. A jury could easily find on this record that plant manager Taylor was fully aware of the racist campaign against Henderson. The evidence is enough to support a finding that SouthSide management had actual notice of the incidents of which Henderson now complains, and that they did nothing about it for months.

Alternatively, defendants argue that the company took adequate corrective action. When Henderson reported to plant manager Taylor that Santerre had tried to hit him with his truck, Taylor spoke with Santerre, who denied the incident. That was the extent of the company's involvement with that incident. A reasonable jury could find that the company's response was insufficient. A reasonable jury could find, for instance, that more intervention and ultimately more supervision were necessary to control such physically dangerous conduct. *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1012 (7th Cir.1994) (plaintiff's complaints largely ignored for four years; employer's meager response was to hold meetings and force employees, including plaintiff, to apologize to one another); cf. *Williams v. Waste Mgmt. of Illinois, Inc.*, 361 F.3d 1021, 1030–31 (7th Cir.2004) (where plaintiff's complaint was addressed within twenty-four hours, supervisors dealt sternly with harassers, supervisors devised plan for plaintiff to avoid harassers, and no further race-based harassment occurred, employer acted promptly and appropriately), citing *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir.2001) (though employer "could have done more," where employer immediately investigated plaintiff's complaints, directed employees to watch sexual harassment video, and asked harasser to switch shifts, employer acted promptly and appropriately).

After Henderson found the dead mice, the company posted a statement that cautioned drivers to keep their trucks clean to keep mice away. A reasonable jury could find that the company's indirect poster about *hygiene* was insufficient to address the *deliberate* harassing behavior or to remedy the wrongs that Henderson suffered. The poster, moreover, addressed only one problem (and did so as if it had been the result of an oversight by Henderson rather than a deliberate act of others). It failed to address the dead mice as part of a larger campaign of harassment, except to suggest that employees not expose others to rodents. There is no evidence that the company had done anything prior to posting its statement to remedy the other problems alleged by plaintiff.

Also, Henderson reported the dead mice incident to SouthSide's general manager Goins at the same time that he reported so many of the other alleged harassing incidents that he had endured. The company's response was to reprimand the offenders—only to rescind the reprimands two days later. At the summary judgment stage, the court must assume that Henderson's account of the harassment directed against him is true. Based on that evidence, a reasonable jury could conclude that two days was not adequate time to launch and complete a reasonable investigation into the complaints by plaintiff.

On the issue of remedy, moreover, plaintiff's evidence would as noted above allow a reasonable jury to find that plant manager Willie Taylor was fully aware of the campaign of racial harassment against Henderson, and that he failed—for months—to take any meaningful steps to remedy the harassment. Taylor was the plant manager. He was the senior manager on site at the Harding Street facility. His failure to try to remedy the problems

can be attributed to SouthSide, quite apart from the arguably feeble efforts made in response to Henderson's complaint to Goins. There is sufficient evidence to convince a reasonable jury that the defendant company was negligent in remedying the harassment.

### Conclusion

For the foregoing reasons, defendants' motion is granted with respect to the claims voluntarily abandoned by plaintiff, including plaintiff's retaliation and state law claims, and to the Title VII claims against the individual defendants, Moistner and Santerre. Defendants' motion is denied as to plaintiff's Title VII hostile environment claim against SouthSide. The court will hold a conference on Wednesday, September 1, 2004, at 10:00 a.m. to schedule a new trial date in this action.

So ordered.